IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 3:10CR124 |
| | ) | JULY 21, 2011 |
| vs | ) | |
| | ) | |
| ERICKA L. FLOOD, | ) | |
| | ) | |
| Defendant. | ) | |
| ______________________________ | / | |

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE UNITED STATES: KURT MEYERS
U. S. Attorney's Office
227 W. Trade Street
Suite 1700
Charlotte, NC 28202

FOR THE DEFENDANT: M. VICTORIA JAYNE
201 Government Avenue SW
Hickory, NC 28602

Proceedings reported and transcript prepared by:

JOY KELLY, RPR, CRR
U. S. Official Court Reporter
Charlotte, North Carolina
704-350-7495

**P R O C E E D I N G S**

(Court called to order at 11:30 a.m. and defendant present in courtroom.)

THE COURT: All right. We'll call the case of United States v. Ericka L. Flood. Is the defendant ready?

MS. JAYNE: We are, Your Honor.

THE COURT: Is the government ready?

MR. MEYERS: Yes, Your Honor.

THE COURT: If the defendant will please stand.

Ms. Flood, do you recall appearing before the United States magistrate judge for the acceptance of your plea?

DEFENDANT FLOOD: Yes, Your Honor.

THE COURT: Do you recall being sworn and answering certain questions there?

DEFENDANT FLOOD: Yes, Your Honor.

THE COURT: Do you recall that you signed a plea transcript form where you said your answers with true and correct at the time they were given?

DEFENDANT FLOOD: Yes, Your Honor.

THE COURT: Were your answers, in fact, true and correct at the time you gave them before the magistrate judge?

DEFENDANT FLOOD: Yes, Your Honor.

THE COURT: If I asked you those same questions today, would you answer be the same.

DEFENDANT FLOOD: Yes.

THE COURT: Counsel, do you believe your client understood fully the questions asked by the magistrate judge?

MS. JAYNE: Yes, Your Honor.

THE COURT: Do you believe she understands the question I've asked her today?

MS. JAYNE: Yes.

THE COURT: Ma'am, you're pleading guilty pursuant to a Plea Agreement where you and the government have agreed to certain facts and factors, and all of that is right and proper to do. However, you need to understand the Court is not required to accept those facts and factors to which the government has agreed and stipulated, and if the Court declines to accept those facts and factors, you'll not have the right to withdraw your plea? Do you understand that?

DEFENDANT FLOOD: Yes, sir.

THE COURT: Do you still want to go forward with the plea?

DEFENDANT FLOOD: Yes.

THE COURT: Based upon the representations made to the Court and the answers given by the defendant at the Rule 11 hearing before the United States magistrate judge, the Court finds, concludes and confirms that the plea is knowingly and voluntarily made, and that the defendant understands the charges, potential penalties and consequences of her plea.

Is there a factual basis?

MR. MEYERS: There is, Your Honor. The defendant agreed to stipulate to the factual basis in the Presentence Report.

THE COURT: Is that correct?

MS. JAYNE: That's correct, Your Honor.

THE COURT: The Court will take that into account and then state that based upon stipulation of the parties and the evidence set forth in the Presentence Report, which report has been carefully reviewed by the Court, and the defendant's admission of guilt, the Court finds, concludes and confirms that there is a factual basis for the defendant's plea. Accordingly, the Court confirms the magistrate judge's acceptance of the defendant's guilty plea and accepts the defendant's plea of guilty. The Court finds the defendant is guilty, and thereupon enters a verdict and judgment.

Have you and your attorney discussed the Presentence Report in this case?

DEFENDANT FLOOD: Yes, Your Honor.

THE COURT: Okay. And do you believe you understand the information contained in that Presentence Report?

DEFENDANT FLOOD: Yes, Your Honor.

THE COURT: Counselor, have you gone over the Presentence Report with your client?

MS. JAYNE: I have, Your Honor.

THE COURT: And do you believe she understands the

contents of that report and the calculations therein?

MS. JAYNE: Yes, I do.

THE COURT: Thank you.

Are there any objections from the -- for the Presentence Report from the defendant that have not been resolved?

MS. JAYNE: Your Honor, we did file objections. I did note that in the response by the Probation Office there were a couple that they acknowledged.

Our objections did not amount necessarily to a change in the level that the probation officer would have found. We did think it was important to clarify the length of time that she had been involved in this, which was a relatively short amount of time.

In addition, we felt it important to clarify, and while it may be semantics to clarify exactly what her title was in the loan company, she was referred to as a broker. That actually is a specific term that's designated for someone who owns a business or has a broker's license. That was not Ms. Flood. Ms. Flood was a loan officer. And in sentencing considerations I felt it was important to point that out to the Court exactly what her role was in the company.

THE COURT: What I see here in terms of her role in the offense, it states in the offense conduct that she operated as a leader in the conspiracy in that she oversaw

numerous tasks in order to facilitate the fraud of home purchases including bribing bank officials, creating false notarizations and relevant bank documents, and recruiting accomplices, among other things.

Furthermore, she operated a company, the Cashmere Group, that allowed her to launder the proceeds derived from the fraudulent purchases for her personal benefit, and these actions resulted in a loss of at least $3,427,690.

MS. JAYNE: She has admitted to that part of this offense, Your Honor, but I do want to point out, and I just had a brief conversation, in Objection No. 3 in terms of offense level computations and the amount of loss, it's not a huge difference, Your Honor -- well, both in Objection 2 and 3, within the indictment, in the debriefings, which Ms. Flood participated in several; after I became her lawyer I participated in one -- there were two transactions, the Quarterbridge Lane and Berryhill Road closings that we simply never had any discussion about. It's not mentioned in the indictment. They're both relatively low loan transactions. I've asked Mr. Flood about those when those came to my attention in the Presentence Report, and to my knowledge, I don't recall them being mentioned in the Offense Conduct.

We did object to those two transactions being included in the overall loss amount. And we've just simply never fleshed out, never had any discussion. I'm told it's in

the discovery, there are some documents in the discovery, but we certainly never had any -- any notice or any discussions about what about those transactions was illegal. It may have been -- and as Ms. Flood obviously has cooperated with the officials for that sometime -- and if she needs to sit down, even after today and meet with the agents and go through those documents, we are happy to do that.

But to my knowledge, I believe Ms. Flood remembers it the same as I do, we've never discussed those.

And I don't want to make that big issue and have that throw off this sentencing, but I think it's incumbent on me as her lawyer to bring that to the Court's attention, those particular transactions, especially since they are not anywhere in the indictment or in the Offense Conduct. We just ask that those not be included in the loss amount.

THE COURT: So the difference between the two, it would be from 3,427,690 to 3,290,290?

MS. JAYNE: If I did my math correct, Your Honor, I just simply took out those two transactions.

THE COURT: Let me hear from the government about it.

MR. MEYERS: Your Honor, the objection was that she didn't believe she was involved in those transactions.

THE COURT: Right.

MR. MEYERS: And so I emailed Ms. Jayne the loan

applications that Ms. Flood was a loan officer for showing her her involvement. Now, Ms. Jayne has asked me this morning, well, can you describe in more detail the fraud involving those two transactions? We're not able to do that because we weren't prepared to respond to that. I thought the objection was is she involved.

We are approaching hundred percent certainty that at least one of them, not both, were in the loss chart we provided to Ms. Flood at the time her Plea Agreement to support the loss number here.

Since it doesn't make any difference to the advisory Guidelines at all or Offense Conduct, I would propose the Court deny the motion to strike them from the Presentence Report but not consider them for purposes of imposing the sentence.

THE COURT: I just want to be sure when I do the restitution as to whether I need to make something there. What I would do is find the total restitution, if she's part of this group of 3,427-plus and then use my discretion to only make her liable for a portion of the three too.

MR. MEYERS: They are not actually included, Your Honor, because in all likelihood the banks that did them are out of business and weren't able to verify the loss.

THE COURT: So they are not included in the -- are they in the 3,427,690 or not?

MR. MEYERS: They are, Your Honor, but that's the loss number as opposed to restitution number.

THE COURT: The restitution number is smaller than that then.

MR. MEYERS: Way smaller, Your Honor, in the sense that I don't think we have been able to verify with any individual bank where the loss was sustained.

THE COURT: All right. Thank you.

MS. JAYNE: I think that's all we have to say about that.

I just want to make it clear, Your Honor, when we filed the objections then I did receive loan applications. I showed them to Ms. Flood. She acknowledged that she recalls taking those applications, but beyond that, we've had no discussions about those transactions.

THE COURT: What I'm going to do is just ask that the Presentence Report be amended to report that she says that she didn't have anything to do with those. She says her -- the total loss in the four transactions should be 3,290,290 rather than the government's contention of 3,427,690. Since that's not going to have any implication on sentencing in any way, I will note, I will add -- I'll not change the figure from what the government is saying other than to add that you disagree with that figure.

MS. JAYNE: Thank you.

THE COURT: Okay. That should correct the record. And since it's not going to impact sentencing, I don't think I have to make any specific finding about which of those particular two numbers is correct.

All right. Let's -- any other motion -- any motions at this time from -- first of all let me find the Guideline range.

The Guideline range it would appear from the calculation here is the total offense level 30, with Criminal History Category I, producing a range of 97 to 121 months, a fine range of 15,000 to 6,855,380, and a supervised release range following imprisonment of -- it looks like would it be 60 months on Count One? Three to five years on Count Five? No. Excuse me. It's going to be -- Count One is going to be two to three years. Count Five, three to five years, and Count Fifteen two to three years.

Is that correct from the government?

MR. MEYERS: Yes, sir.

THE COURT: Is that correct from the defense?

MS. JAYNE: Yes, sir.

THE COURT: Okay. Any motions from the government for a departure?

MR. MEYERS: Yes, Your Honor.

The government filed a motion, with apologies, late last night for a downward departure to reflect the defendant's

substantial assistance in the government's investigation.

It was perhaps unusual from the Court's perspective, but what the government tried to do is lay out both the positives and the weaknesses, if you will, in the defendant's cooperation, which is ultimately resulting in a government recommendation of a downward departure of 25 percent.

This case, the bank bribery case, started about four months after the mortgage fraud investigation began. And what was unusual about it is there was a bank employee, I believe it was at Bank of America, who called up or who contacted the FBI and said someone just tried to bribe me and they just tried to bribe me by providing --

THE COURT: Excuse me one second.

(Confers with law clerk.)

THE COURT: I'm trying to find your motion.

MS. JAYNE: It's also a surprise to me. I don't have it either.

THE COURT: Yeah. I'm sure.

These are late filings we can take care of pretty easily. There are some of them, like the objections today, rather than -- make it a little bit difficult to do in the last case. Okay. Go ahead and proceed, counsel.

MR. MEYERS: So this honest bank employee notified the FBI about an attempted bribery. It turned out the attempt -- the person who was attempting to bribe here was

Ms. Flood. The FBI conducted, with the assistance of this honest bank employee, a sting operation, if you will, to determine if the bribe was for real.

The honest bank employee had a conversation which was recorded with Ms. Flood and arranged for a deal in a parking lot in which Ms. Flood showed up with cash in order to bribe the bank employee and to obtain a fraudulent Letter of Credit. The attempted letter was in the millions of dollars.

Ms. Flood was arrested on the spot in the parking lot of Bank of America. Ms. Flood went back with agents from the FBI and IRS and immediately indicated her attempt to cooperate. What Ms. Flood did was lay out for these agents what -- the bribery the conspiracy had consisted of.

She named the people that she had recruited and bribed from the banks. She named Leonard McClain, who was the financier, the one she was working with -- working for, I think it's proper to say with the regard to bank bribery conspiracy, and provided very, very significant lead information.

The reason these two men got this lead was because Ms. Flood was already a target of their mortgage fraud investigation. So when the name was given, the tip, if you will, was routed to these two men. So I want to praise Ms. Flood's cooperation with regard to the bank bribery investigation.

Now, perhaps to her surprise they also started asking her about mortgage fraud. We didn't expect it to be wonderful in the beginning, and unfortunately it wasn't the same kind of cooperation. And I can go into details if necessary. I prefer not to. But she said some things that just weren't right. And I don't want to criticize her for that any more that is necessary, but I'm prepared to defend that decision if necessary with some examples that we have.

So we broke off working with Ms. Flood, even though she had been valuable for the bank bribery, someone has to be truthful full bore in order for us to rely on the information because what we're doing is very serious work. So we broke off. Ms. Flood as indicted.

She eventually, after a period of time, indicated her intent to plead guilty to those charges in the Plea Agreement, entered her plea in January of this year. I think it was January 4th when she entered her guilty plea. We debriefed her after that.

Ms. Jayne had done lot of work on the case. She had an investigator that worked with her. And assured us -- she has an excellent reputation, as the Court I'm sure knows. Ms. Flood is ready to really come forward on the mortgage fraud and we found that to be the case.

So we debriefed her. Her cooperation at that point, though, was really limited to Sarena Mobley, who was a

part-time actress, part-time flight attendant from Los Angeles, who was a straw buyer in the mortgage fraud scheme and who submitted false information in exchange for a $200,000 kickback.

Ms. Flood provided details about that fraud by Ms. Mobley that were corroborated by the documents and corroborated by co-conspirators, so this time we were sure we were getting the straight information, if you will. And I think that that cooperation was part of the mix that caused Ms. Mobley to plead guilty.

Now because Ms. Flood would have been subject to pretty vigorous cross-examination based on her prior statements, because Ms. Mobley was someone -- the only person left, if you will, by that time, and there was lots of other cooperators, we think that a 25 percent reduction is about all that would be appropriate.

We weighed Ms. Flood's cooperation against others. People who have come in early on Bills of Information in this case, and there's been 38, as the Court knows, and approximately 25 or so that have been sentenced already, folks who have come in on Bills of Information early, provided full, substantive, truthful information have gotten 40 percent reductions. Those who have come in early on Bills of Information and who have been more hesitant, if you will, but not outright false information, have gotten 30 percent

reductions. We think a 25 percent reduction for Ms. Flood given of the total mix of information is about right.

So the recommendation, Your Honor, is to take Ms. Flood from an Guideline range of 97 to 121 months and to take 25 percent of 97, which would be a 73-month sentence, and to move Ms. Flood to an offense level 26, for a range of 63 to 78 months.

THE COURT: Thank you.

Ms. Jayne, any comment on his evaluation of your client's cooperation and the 5K motion?

MS. JAYNE: First of all, we appreciate the 5K motion and as Your Honor said, Mr. Meyers showed it to me this morning and I actually read his copy -- I don't have one in front of me -- but I did digest it during the last hearing.

We certainly -- we think it's very appropriate for that the government to make a 5K recommendation, and I don't quarrel with much what Mr. Meyers said, if any.

What I will tell the Court at this point is, as I sit here I was appointed to represent Ms. Flood when she had already been indicted. She was indicted some two-and-a-half years after her -- I think December '07, then she was indicted in June of 2010 -- I think I've added that right, two-and-a-half years later on what she is here for today.

During that two-and-a-half years she was out on bond. My understanding from her previous lawyer, Mr. Andy

Culler, is there were a number of meetings, some of which he attended, some of which he didn't, between Ms. Flood. I was not privy to those so I don't know first hand where the breakdown occurred.

But certainly Ms. Flood, when I met her and when we started to go through these transactions, there's a difference, Your Honor, in, I think, omitting information and being somewhat -- and being paralyzed by the realization that you have federal agents, you know, that have caught you and have interrogated you and that up until this point with the high school -- a high school diploma, you have led a lawful life, and suddenly just the overwhelming realization of the wrongdoing sometimes I think causes -- just causes a human being to forget things and to break down.

When we met I know she did talk about all the documents and she explained things. So I certainly appreciate and would ask you to adopt their recommendation. And then I would like to be heard further on your consideration in additional sentencing factors.

THE COURT: Okay. The Court is going to adopt the government's evaluation of the defendant's cooperation. It would appear it was a very even-handed report of that, and there was one of those situations where there was a breakdown and it was helpful on one and not on the other. I'll get into the sentencing in a moment, but that happens sometimes. You

know, it's one of those things that defense lawyers try to tell your clients don't try to shape your testimony around what you think that they know because you don't know. Maybe they don't know it, maybe they do. And if they do and you don't tell them, then it doesn't work out for you.

Okay. All right. Any motions? There are no variance motions here. Any motions for any variances? Are they going to handle everything from the 5K?

MR. MEYERS: Yes, sir.

MS. JAYNE: From the government.

THE COURT: From you. There are none filed at this point.

MS. JAYNE: Your Honor, we just filed a Sentencing Memorandum, and you have that in front of you.

We filed a Sentencing Memorandum on the 19th, and covered certain factors and attached some letters which we'd ask the Court to consider, as well as the Nonattribution Agreement my client has entered into. Just contained within that sentencing we're requesting a variance. Of course, Your Honor, that was filed before I knew the government was going to file a 5K so ...

THE COURT: Okay. Ms. Jayne.

MS. JAYNE: Your Honor, in addition to the downward departure that has been accepted by the Court and recommended by the government, we would ask you to take in as an

additional consideration, both the Presentence Report tells you about my client's life before this occurred and what the letters tell you.

And I do want to note for the Court I do have some members of Ms. Flood's family -- I will not ask them to address the Court. They have written letters which we provided to the Court. But we have in the courtroom her mother. Would you stand up? Ericka Flood's mother. We have her uncle, whom I understand was previously involved with the federal court system in Miami; he was a federal magistrate. Her godfather and also minister is here. And who else is here for Ms. Flood? Friends, and other friends. Who is this? Thank you.

These people are here, Your Honor, because they want you to know, and they have expressed in their letters I think quite eloquently, that Ms. Flood to them has been nothing other than a caring and thoughtful, law abiding, good mother as far as they knew before this occurred.

What you also know from the Presentence Report, Your Honor, is that my client is a high school graduate. She started out, she worked very hard, found her way into the mortgage business; became a loan -- started taking applications. And certainly as she began working in the mortgage business, she certainly didn't have any idea that she would find herself involved in this very serious mortgage

fraud scheme.

While she was working in the mortgage business, she was introduced to Elizabeth McPhaul, who I think you'll take up her case later on today. Those four transactions which then Ms. Flood voluntarily involved herself in were packages that were brought to her by McPhaul and it was an opportunity and she will tell you in her own words as she said many times she became quite enamored with Ms. McPhaul. She became mesmerized by the idea that she could make more money, not to lead a lavish lifestyle, but as her family would attest to, the extra money that she made went to support her daughter. It went to support her ex-husband, who was seriously ill with leukemia, and to assist her mother and some other family members.

And as is most case -- or as all the case for individuals like Ericka that find themselves in illegal activity of this kind, she became greedy and she'll tell you that. It was a way for her to make the money that she didn't think she would ever make. The first time that she became involved in the first transaction, she really was naive about what she was being asked to do.

She had a corporation called Kashmir Group, and it was Liz McPhaul's idea to use that Kashmir Group to put this additional money into.

Now, Ms. Flood, she's not -- she is certainly

intelligent and she realized, as they began to pursue these transactions, that she was involving herself in illegal activity, probably not so much with the documents that she initially saw, but certainly when it was suggested to her that they needed notaries; that they needed letters of credit; that they needed statements of income. She became the conduit. She was certainly the head of the wheel. She certainly was an integral part of this mortgage fraud scheme.

And that's one reason, Your Honor, why after discussions, honest discussions about her involvement, we didn't come in here, Your Honor, and object to the leadership role that's been placed on her. She admits that. She admits that she was involved in soliciting these bank employees that you have heard about, the notaries and another individual that I think was in the office that you'll hear from, Alicia Taylor.

Ms. Flood became -- she became involved in this scheme and she has plead guilty to that, Your Honor. But her history as a law-abiding citizen, her history as a good mother, as someone who participates in her church, as someone that her family has been proud of certainly made it all the more difficult for her when she faced the realization that she had involved herself in this illegal activity.

And I really believe, Your Honor, that that's part of the reason why early on in the debriefings with the

government, recall right after she was arrested in December of '07 she met with the agents without the benefit of the counsel being present, and even at that point she admitted to her involvement in bribing in some of these -- in bribing bank officials.

Then she retained counsel and received a Nonattribution Agreement, and continued to provide information. When I started to represent her, she -- then we met with the agents and with Mr. Meyers. And she went over the transactions again and provided additional information regarding Sarena Mobley, which as Mr. Meyers has indicated led, we think, led to Ms. Mobley pleading instead of going to trial. But if she had gone to trial, Ms. Flood was certainly ready, willing to testify against her, and she would have testified truthfully.

It's important, Your Honor, as I stated earlier, that for two-and-a-half years after she was initially arrested on this bank fraud that she has remained out on bond. She has abided by all terms and conditions of probation. She has been able to get a job in a nursing home, a nursing home facility -- is that what it's called? A medical office. She has been able to get a job. But in the meantime, Your Honor, she has certainly paid the price for her part in this in that she has lost her home, she has lost her car, she has lost her reputation, her ability to work in an area in which she had

developed quite a bit of legal expertise before she fell into this mortgage fraud scheme. She has certainly suffered the shame and embarrassment with her family of having to admit to them about her involvement in this.

We would ask, Your Honor, that you take into consideration her previously law-abiding life -- I meant otherwise law-abiding life except for involvement in this particular scheme. That you take into consideration the fact that she did cooperate; the length of cooperation, the length of time that she remained in contact with the agents before she was ever indicted.

And, Your Honor, I certainly, I trust that it's not -- Ms. Flood was not expected to know the legal system in terms of a Bill of Information and -- she listened to what her attorney told her. She met with the agents. By the time I became involved, she had been indicted. So if there was an opportunity for a Bill of Information at an earlier time, it just didn't come in the same way that perhaps it came in other situations. So I wouldn't want that to be held against her or to make that appear that she wasn't cooperating because she was cooperating.

So we would ask that Your Honor certainly adopt what the government has recommended.

I know they have recommended a 25 percent reduction. There's a couple of different ways to look at that.

I spoke to Mr. Meyers. I said, you know, the way you decide the 25 percent can be interpreted a number of different ways, and one way to do it, Your Honor, is to consider 25 percent off of the level that -- level 30 which would take her down between level 22 and level 23. She has no prior record, so she is a level one for sentencing.

So, Your Honor, we just ask for an additional variance in addition to what the government has already recommended.

Ms. Flood recognizes that she may certainly serve active time. She is concerned about her daughter. She is the sole provider, caretaker for her daughter. If Your Honor would consider house arrest for her, consider some sort of community punishment, she would certainly abide by all terms as she has done for the past -- now it's been over two-and-a-half years, it's been three-and-a-half years since this all originally came up.

And otherwise, Your Honor, if she does receive a period of incarceration, if you would allow her to self-report.

And I think Ms. Flood would like to be heard.

THE COURT: Let me hear from the government first and then I'll hear from her.

MR. MEYERS: Thank you, Your Honor.

Just one correction before I start. I don't

think -- it was inadvertent certainly, Ms. Jayne referred to sort of the constant contact and cooperation since December of 2007. That's not the case. Ms. Flood did start to cooperate in December of 2007. It was broken off in April 2008.

THE COURT: You all broke it off after you felt like she was not leveling with you on the mortgage side.

MR. MEYERS: After the same question was asked numerous times without a truthful answer. We did try very, very hard, and gave her numerous opportunities.

So between April 2008 and January 2011 there was no contact. No cooperation. No contact. It was, "I'm sorry it didn't work out. We're going to proceed with our investigation." So I just want to make that clear.

I don't want to take too much time. I think the Court understands the seriousness of the offense and the nature and circumstances of the offense. It was like extremely serious. We're talking about well in excess of $5 million worth of loans here that have caused a tremendous amount of loss; over $3 million. The need for adequate deterrence in this case and in the mortgage fraud area is extremely serious, especially with a leader like Ms. Flood. Someone who reaches almost every sector of the professions with bribes and schemes, reaching into the banks to bribe people, reaching into the offices of the Notary Public of the Secretary of State to defraud people. Forging documents.

Falsifying employers. This was a case that took a extreme amount of cleverness and diligence by this defendant and her co-conspirators in order to pull off. It's caused tremendous damage in these neighborhoods.

I'm asking far a sentence that's 25 percent off the low end of the advisory Guidelines, which is 73 months imprisonment. I believe that that is a sentence that is sufficient to achieve the objectives of 3553, and to provide just punishment and act as a deterrence.

THE COURT: So you're asking for the range of 62 to 78, and you're asking for a sentence of 73 months.

MR. MEYERS: 73, Your Honor, which is --

THE COURT: It's a lot of time. You know, we do -- and I'm not being critical, I'm just making a statement, we end up throwing around months and years like they are five and six dollars, seven dollars, and they are years of a person's life. Seven years is ten percent of someone's -- ten percent of someone's life.

MR. MEYERS: There's no doubt, Your Honor. It's a tremendous amount of time.

THE COURT: And you have a first offender with a 12-year-old child. But this is a bad crime, too. This is not a home detention kind of case. This is the one where there's nothing wrong with what the government is asking in the case. I'm probably not going to go with that sentence, but there's

nothing wrong with what they are asking. There are a lot of judges that would. A lot of judges might go higher than that.

MR. MEYERS: Your Honor, I've not asked for such a sentence for any other person on the 25 except for Drew Sharreff-El in this case. The reason I'm asking for the sentence is because it reflects what this defendant did, and every other defendant who has pled in this case, all 38 have looked at the advisory Guidelines. They've come in early. They have come in when their losses were not fully developed in some cases. They've all received Guideline sentences, all 25, except for -- in addition to the 5Ks except for I think Demetrius Rainer who received a very, very modest five-month downward variance, and there have been two defendants who received a government-sponsored downward variance on the basis of cooperation that did not rise to the level of a 5K.

So what I'm asking from Your Honor is the same Guideline sentence, advisory Guideline sentence, that every other defendant in this case has received and it reflects the fact that this defendant was one of the two leaders of this conspiracy and the amount of damage that it's caused. I don't ask for the sentence lightly, but I would ask the Court not to go below that sentence in fairness in part to all the other defendants who have taken action and who have pled guilty, and who have done so in contemplation of the Guidelines as opposed to a defendant who did not do what she was supposed to do

early on.

Now, I think that it goes both ways because this defendant did try -- well, this defendant did perform some cooperation which was worthy of recognition early. So I just wanted to make the Court understand that I don't ask for such a sentence lightly and have not asked for such a sentence but in one other case.

THE COURT: I'm not critical at all. I've got to make an independent decision on what to do. I'm not critical of the government's position on this at all. No. I think the government's been very, very, very good in this, even when the Court has not always agreed exactly with what their sentence is. I've thought this through and these are serious matters.

MR. MEYERS: I have nothing further, Your Honor. Thank you.

THE COURT: On the 5K I am going to go ahead and depart downward based on the government's recommendation to -- on an Guideline range of 97 to 121 months, which is a level 30, Criminal History Category I, to an offense level 26 with a Criminal History Category I for a range of 63 to 78 months.

All right, ma'am, I'll hear from you on sentencing.

MS. JAYNE: Well, Your Honor, I think I probably have already stated our position based on the sentencing memorandum.

And I -- there is no doubt from the facts that

Ms. Flood did what she admitted and what she's pled that she did, Your Honor. She didn't come up with this scheme. She didn't know who these people were all in California and all these, you know, straw buyers and all these people. She became involved in it voluntarily when Elizabeth McPhaul walked into her office with four loan packages. That's how she got started in this.

I'm certain, although I wasn't there, but I know from reading the discovery and talking with Ms. Flood that she did give quite a bit of information to the government. She gave them names. She gave them documents that she had kept. And what concerned me at the beginning when I began to kind of try to put together what did she give them after she signed the Nonattribution Agreement. What information did she give them. I have no doubt that the government already knew about this. There's no doubt about that. But what matters from my client's perspective is the cooperation that she attempted to give; whether it was everything they were looking for. Evidently it wasn't, and it's unfortunate that I wasn't there so that I can't absolutely tell the Court I know for a fact she recognized these documents, that she provided these, that she gave them names.

THE COURT: I can't put the genie back in the bottle. There's no evidence that previous counsel was not diligent or anything like that so that I can sit here and go,

well, had she had diligent counsel maybe she would have understood of the problems she was entering into by saying, yeah, I'll help you with all these bank folks that I'm not friends with, but not these mortgage people that I am friends with, and that's understandable, why people do that.

I mean, I'm not saying that's what the reason was, but I've seen that occur. I have had it happen both as a prosecutor and where I've not given full cooperation when they helped with some and not with those, and as a defense lawyer, where I've tried to talk to my client -- there's somebody they just don't want to give up. That can happen. That's human nature. There's no way I can figure out, without evidence, that the previous counsel was not diligent. There's not really much I can do to say, well, I'm going to forget that now that they've got Ms. Jayne.

Obviously you've connected with her. That's been able to get her to help or to be truthful about it. But she came in late. They are giving her something there. Your Honor, if they weren't -- your argument is they had just said we're not going to make a 5K. She helped us but it wasn't enough, and by golly, we're just not going to make the motion, then I could consider on a variance issue all those things that she had done if they had made a decision not to move on that. The Court might believe they should have had made a motion, a decision. But they moved on this and significantly

they moved for that Guideline range in view of the lack of full cooperation before you got involved.

MS. JAYNE: Yes. I don't want to disparage Mr. Culler at all because he was her prior attorney and I have had a --

THE COURT: And sometimes it's just the connection. Sometimes defendants will be more forthcoming with one attorney who might be just as good as another attorney and the next defendant would be more forthcoming with the first attorney then the second attorney, but I can't just magically decide that's what happened.

MS. JAYNE: Sure.

And I think just, without belaboring the point, one thing may have happened to Ms. Flood. It's one thing to say tell us everything you know. It's another thing to put a document out and say what can you tell us about this document and what can you tell us about this signature, and that sort of thing, which clearly -- and I know from talking with Mr. Culler -- and I can share with the Court, because I did have a long conversation with him about what he could recall -- if he were here I know that he would tell Your Honor that he felt that Ms. Flood was certainly not -- she wasn't lying about anything and that she was trying to cooperate. But, frankly, just as Mr. Meyers has said, this was a huge complex scheme. There are thousands of documents. There are

thousands of documents that pass through Ms. Flood's hands.

THE COURT: There was a lot of active stuff going on, actively going to someone, actively bribing them. That's a big deal. That's bribery. There were a lot of factors in this that even though -- Ms. Flood has a -- certainly a better criminal history and better background than, say, another defendant that we might all have information on at this point of the day. She was definitely -- she met the four points for sure.

MS. JAYNE: Yes. And we didn't object to that.

THE COURT: I know that.

MS. JAYNE: I think just her acceptance of responsibility that she has come to live with since this happened --

THE COURT: This is not a pleasant thing for me. I don't want like sentencing mothers or fathers of young children to jail, but it's -- you know, that's -- I have to do what I have to do whether I like it or not.

MS. JAYNE: Ms. Flood recognizes that. She does recognize that. She is not -- she doesn't expect anything but a fair sentence, and we trust that you will do that. That you have considered all of the factors. I think I have probably said all that I can say on her behalf right now except to reiterate that I think that from her standpoint that she wanted to be honest, she wanted to cooperate, she wanted to

prove that she is a person of character, and that she certainly had remorse for ever getting involved in this situation.

THE COURT: And I think she has done that, but we've got to deal with now what she did; the good, the bad, the ugly. The whole thing. We've got to put it all together and come up with a sentence. She has done that. I'm not saying she is a lady of bad character in any way at this point. She has done -- she appears to be a good person who did a bad thing over a significant period of time, not just one act. This took some thoughtful stuff to go through. They have identified her as a major leader in this thing, I think quite properly from what I've seen.

Yes, sir.

MR. MEYERS: I don't want take up too much time, Your Honor. I want a -- we did put a document in front of her. We put lots of them. Just to give the Court one example, we put the phoney Verification of Employment for Sarena Mobley in front of Ms. Flood in December '07. She said, "I verified that."

"Do you know anything about it?

"Nope."

We put it in front of her again in February. She said, "Oh, yeah, Carr was the owner of that and I understood he instructed me to do that."

In April she said, "Oh, I later discovered that document was fraudulent."

Then in January of '11 finally, after we talked to everyone, now we had to come up with an employment for Mobley; talk to Carr about it. We agreed to use this company for it. I want to make sure there's dozens of those.

THE COURT: And it's a difficult thing. One of the things you have to do is that we tend to minimize the swings and misses we do in life and we tend to maximize the things that we do well. It's counterintuitive. When you're cooperating with the government, you need to maximize the bad things that you did, and that -- you actually get happier the more that you maximize the bad things that you did.

But it is counterintuitive to be able to get to do that. And then you've got normally loyalty to friends and not saying bad things about them is a good thing. But when you're involved in a crime and trying to put the crime behind you, you've got to get people to do things that you would normally consider to be a bad character thing; that is, saying something negative on a friend. That's a positive thing in getting into this because they committed a crime and you committed a crime with them. So all of those things come into play.

But, you know, I think the government's right on the level where this falls. I'm going to sentence her within that

Guideline range today. But let me hear from her before I pronounce sentence.

DEFENDANT FLOOD: I just want to say that three-and-a-half years I've thought about this every day, the choice, the mistake I made, and I have to look at my daughter every day and know that I made this mistake.

THE COURT: I know. I know. I'm so sorry about this because I know there's going to be a lot of stuff you're going to miss when you have to go off to jail and she is going to miss too.

DEFENDANT FLOOD: The fact that her daddy's --

THE COURT: I heard -- I mean I feel it, but that's not my job is to sentence based on how I feel about something. I have to try to be as straight forward about my thoughts on this as I can.

This appears to be a case where there was serious involvement by you in a serious crime. Where there was some cooperation but not full cooperation. I wish there was. I wish there had been. It would make it a lot easier on me to be -- outdo the government on its recommendation. But in this case, it appears they have evaluated the case very, very well. And I'm going to have to sentence you within that Guideline range, and it's not a happy job I do. Sorry.

MS. JAYNE: That's all we have, Your Honor.

THE COURT: Let's go ahead and go ahead with

sentencing then.

Okay. Pursuant to the Sentencing Reform Act of 1984 and *United States v. Booker*, it is the judgment of the Court having considered the factors noted in 18 U.S.C., Section 3553(a), that the defendant, Ericka L. Flood, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 60 months on Count One, and terms of 63 months on each on Counts Five and Fifteen to be served concurrently for a total of 63 months. In granting the 5K motion of the government and in sentencing within that Guideline, at the lower end of the Guideline, the Court considered all of the factors in 18 United States Code, Section 3553.

And with regard to the defendant's cooperation, it's noted that the defendant was found to be truthful and reliable in her cooperation. That there was some issue about timeliness which made it difficult for the government to give her a full one, and they have listed what their difficulty's were in there. She did assist very, very well in one facet of the investigation, and the Court has taken all of that into consideration in granting that.

Also, the Court is attempting to balance this defendant's sentence with others so that there is not unwarranted sentencing disparity between defendants charged with the same case and certainly not in this case. There may

be warranted disparities but not unwarranted disparities between them.

It is further ordered that the defendant be required to support all defendants from prison earnings while incarcerated as outlined in the Presentence Report.

The Court further recommends that the defendant be allowed to participate in any educational or vocational opportunities while incarcerated. Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years. These terms consist of terms of three years on each of Counts One, Five, and Fifteen, all terms to run concurrently.

Within 72 hours of release from the custody of the Bureau of Prisons the defendant shall report in person to the probation office in the district to which the defendant is released. While on supervised release, the defendant shall not commit another federal, state or local crime, shall comply with the standard conditions that have been adopted by the Court in the Western District of North Carolina, and shall comply with the following additional conditions: The defendant shall be prohibited from engaging in any occupation, business or profession requiring the handling of monetary instruments during that period of time without the specific knowledge and permission of the probation officer.

It's further ordered that the defendant shall pay to

the United States a special assessment of $300. Should the Court determine the amount of restitution owed to each victim, the defendant shall make -- it is further ordered should the Court determine the amount of restitution owed to each victim, that the defendant make restitution as directed. Any payment that is not payment in full shall be divided proportionately among the victims named.

The Court gives notice that this case may involve other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein, and may order such payment in the future.

It is further ordered that the victim's recovery is limited to the amount of their loss, and the defendant's liability for restitution ceases if and when the victims receive full restitution.

It is further ordered having considered the factors noted in 18 United States Code, Section 3572(a), the defendant shall reimburse -- excuse me. The defendant -- the Court shall not require reimbursement of court appointed-attorneys' fees.

The Court finds the defendant does not have the ability to pay a fine or interest. The Court having considered the factors noted in 18 United States Code, Section 3572(a) will waive payment of a fine and interest in this case. Payment of the criminal monetary penalty shall be due

and payable immediately. The Court has considered the financial and other information contained in the Presentence Report and finds the following is feasible: If the defendant is unable to pay any monetary penalty immediately, during the period of imprisonment, payments shall be made through the Bureau of Prisons Inmate Financial Responsibility Program. Upon release from imprisonment, any remaining balance shall be paid in monthly installments no less than $50 to commence within 60 days after release from imprisonment until paid in fuel. Throughout the period of supervision the probation officer shall monitor the defendant's economic circumstances and shall report to the court with recommendations as warranted any material changes that affect the defendant's ability to by any court-ordered penalties.

Is there any legal reason why this sentence should not be the sentence in this case from the defense?

MS. JAYNE: No, Your Honor, other than what we've already put before you.

THE COURT: Anything from the government?

MR. MEYERS: No, Your Honor.

MS. JAYNE: Your Honor, may she be allowed to self-report?

THE COURT: Certainly she will. The defendant will be allowed to remain on the same bond. Any objection from the government for that by the way?

MR. MEYERS: No, sir.

THE COURT: Remain on the same bond, and will be allowed to report to the prison she is designated to at the time and place designated.

You need to be there on time. Remember that. When we let you report, if you they say you have to be there at 12:00 noon, you've got to be there at 12:00 noon, not 1:00. It's one of those things that you just really have to keep up with or you create another issue for the court. Okay. So don't be late in doing that.

I will also recommend that the defendant be sentenced to the lowest level prison facility which she would be eligible for. This is a nonviolent crime by a virtual first offender, and I think that would be appropriate.

To the extent it does not require a higher level of incarceration, in order to effect that the next thing I would ask that she be placed at a location to Charlotte, Mecklenburg County, so visitation can be facilitated, notably with her daughter.

I hereby advise you, Ms. Flood, that you have a right to appeal this sentence to the United States Court of Appeals pursuant to the Federal Rules of Appellate Procedure. Subject to any waivers contained in any Plea Agreement, you also have the right to appeal the finding of guilt upon which this sentence was entered.

Thereby, I advise you that you've waived certain appellate rights to the extent set forth in your plea agreement, and that waiver is binding unless for some reason that contract would be broken, then you would be able to -- the government would be able to do that.

Notice of appeal may be filed within 14 days of the entry of judgment or notice of appeal by the government. If requested, the clerk will prepare and file a Notice of Appeal for you. I also advise you if you're unable to pay the cost of an apply, you may apply for leave to appeal without prepayment of such cost and may apply for appointment of appellate counsel. I would ask that you discuss your appellate rights with your very able counsel, Ms. Jayne, so you can determine whether you want to appeal this.

Do you understand?

DEFENDANT FLOOD: Yes.

THE COURT: Do you understand your rights to appeal, Ms. Flood?

DEFENDANT FLOOD: Yes.

THE COURT: Do you have any questions for the Court?

DEFENDANT FLOOD: No, Your Honor.

THE COURT: Anything further from the defendant?

MS. JAYNE: No, Your Honor. Thank you.

THE COURT: Anything further from the government?

MR. MEYERS: No, Your Honor.

THE COURT: This matter is a concluded.

(Hearing concluded 12:30 p.m.)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**

**CERTIFICATE OF REPORTER**

I, JOY KELLY, RPR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

S/JOY KELLY

**JOY KELLY, RPR, CRR** **Date** ____________
**U.S. Official Court Reporter**
**Charlotte, North Carolina**